IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

vs.                                           Case No. 10-40045-01-SAC

MARCELO SANCHEZ-PEREZ,

                Defendant.

MEMORANDUM AND ORDER

This case comes before the court on Defendant's motion to suppress drugs found in the vehicle he was driving, and to suppress statements he made after he was given *Miranda* warnings. The government opposes the motion, challenging defendant's standing and his factual assertions. Defendant challenges the legality of the initial stop, his detention, the search of the car, its transportation to another location, and his waiver of *Miranda* warnings.

**Facts**

Defendant is charged with one count of possession with the intent to distribute 2.25 kilograms of cocaine base (crack cocaine), and one count of possession with the intent to distribute .75 kilograms of methamphetamine. On March 23, 2010, the defendant was driving a Dodge pickup eastbound on I-70 in Wabaunsee County, Kansas. Highway Patrol Trooper B.K. Smith was turning around in the median when he observed a Dodge pickup drive by, and pulled out after it. Trooper Smith pulled up alongside the vehicle to see if the occupants were wearing seat belts, saw two men,

then pulled behind the truck and followed it for approximately one mile. Trooper Smith testified that while following the truck, he saw it touch the fog line on the right three times within one-half mile. Believing the driver had committed a lane violation and concerned that the driver was tired or intoxicated, Trooper Smith stopped he truck.

Trooper Smith approached the truck and spoke to the defendant, who was driving, and the passenger, Mr. Guillermo Parra-Garcia. The conversation was sometimes in English and other times in Spanish. He saw two air fresheners hanging from the mirror, a single key in the ignition, some luggage and a drink cooler. He told them the truck kept coming over the white line, and asked defendant if he was tired. Defendant said he was not. Trooper Smith then asked about their travel plans. Defendant first said they were coming from Salina, then said from California, then said from Compton, California, and that they had just spent the night in Salina. Defendant then said he had driven to California to pick up the passenger and was bringing him back to look for work in Lecompton, Kansas. Trooper Smith testified that Lecompton is a very small town with few businesses and lacks a large Hispanic population.

The trooper then asked for the driver's license and proof of insurance. He testified that defendant's hands were visibly shaking as he handed the paperwork to him, that his nervousness was more than was typical in a traffic stop, and that it did not subside during the entire stop. Neither man made eye contact with the trooper, and the passenger squeezed a hand exerciser, which the trooper found unusual and a sign of nervousness.

The defendant's driver's license was from Washington, and the vehicle's proof of insurance was in the name of Orlando Tepete-Abalos, 1318 N. 2d Street, Kansas City,

2

Kansas. The insurance was short-term, for three months only, and was expired. Trooper Smith found the address to be suspicious because he had worked in that area frequently and knew it to be an industrial area rather than in a residential neighborhood. At some point, the trooper asked who owned the truck and the defendant told him, after a slight hesitation, that it was owned by his cousin, Orlando.

Trooper Smith then returned to his patrol car and checked defendant's driver's license and the passenger's Mexican identification card. He found that defendant's driver's license was valid, that no arrest warrants were outstanding for either person, that the truck was properly registered, and that the truck was not reported to be stolen. The trooper then walked back to the vehicle, said, "Okay," and returned all documents to the occupants. He issued a warning, explained it would not require payment of money, and told defendant to stay in one lane. He then asked what kind of work defendant did, and defendant responded by reaching into the back seat, grabbing some clothes, and saying "sell clothes." Approximately eleven minutes and 23 seconds after the initial stop began, Trooper Smith said, " Have a good trip. Adios," and moved away somewhat from the car window. He then immediately leaned back toward the truck and asked if he could ask a couple more questions. Trooper Smith testified that defendant responded agreed.

Trooper Smith then asked whether defendant would consent to a search of the vehicle. The government contends that the defendant consented and neither occupant limited consent in any manner nor objected to the subsequent search. The defendant says that he did not consent to a search, and that if anyone gave consent, it was the passenger whose consent was invalid since he had no ownership or legitimate

3

possessory interest in the vehicle.

Trooper Smith asked both men to get out of the truck, then searched it. When he opened the hood he immediately noticed tool marks on the intake manifold of the engine or its bolts, indicating that the manifold had been removed. Trooper Smith had previously participated in seizures of drugs from Dodge trucks, and knew that the intake manifold was often used by smugglers to transport drugs. The trooper then turned the truck on, and saw that its "check engine" light, which had been obscured by a religious sticker, came on. This indicated to him the increased possibility of drugs being in the truck's manifold. Trooper Smith then had defendant follow him to Troop B's nearby facility. At Troop B, a drug dog alerted to the truck, and defendant was arrested. Drugs were found in the truck's manifold.

**Standing**

The government first asserts that the defendant, as a non-owner driver, lacks standing to raise a Fourth Amendment challenge. "Fourth Amendment rights are personal and cannot be claimed vicariously." *United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (quotations omitted), *cert. denied*, 532 U.S. 989 (2001).

> Whether a defendant's own Fourth Amendment rights were violated by a challenged search turns on the classic Fourth Amendment test: whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively

4

reasonable. This court has held that, in order for a defendant to show such an expectation of privacy in an automobile, the defendant bears the burden at the suppression hearing to show a legitimate interest in or [a] lawful control over the car.

*Id.* (quotations and citations omitted).

"Where, as here, "the proponent of a motion to suppress is ... not the registered owner ... the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.' " *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990)). We consider: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Allen*, 235 F.3d at 489.

*United States v. Eckhart,* 569 F.3d 1263, 1274-75 (10th Cir. 2009).

It is uncontested that defendant neither owned nor leased the vehicle. Where, upon inquiry, a defendant fails to establish any connection to the owner or a person with authority to grant possession, no standing exists. *See e.g., United States v. Betancur*, 24 F.3d 73, 77 (10th Cir.1994); *United States v. Martinez*, 983 F.2d 968, 973 (10th Cir.1992), *cert. denied*, 508 U.S. 922 (1993). Where, however, the defendant establishes even a slight connection to the owner, standing is usually found. *See e.g., United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir.1993).

Here, defendant accurately gave the owner's name, said the owner was his

5

cousin, and said the owner had loaned him the truck. A computer check revealed that the automobile had not been reported stolen, and the insurance, although expired, was in the name of the person defendant said was his cousin who loaned him the truck. These facts are sufficient to establish a valid possessory interest in the truck, supporting defendant's challenge to his detention and to the search of the truck.

**Initial Stop**

Traffic stops are scrutinized for lawfulness under the two-prong analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which asks "whether the officer's action was justified at its inception," 392 U.S. at 20, and whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. Defendant challenges both prongs.

"A traffic stop is justified at its inception if an officer has ... reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, --- U.S. ----, 129 S.Ct. 2881, 174 L.Ed.2d 591 (2009). Defendant contends that Trooper Smith lacked reasonable suspicion to believe that defendant violated any traffic law.

Trooper Smith testified that he reasonably suspected the plaintiff of violating KSA § 8-1522, which states:

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, .... [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Trooper Smith testified in a credible manner throughout his testimony. He stated that he traveled in the same lane as did the defendant and that nothing in the roadway itself, in the weather conditions, or in the traffic conditions would have caused a driver to swerve. Specifically, there was no defect in the pavement, no object on the road, and no rain, hail, or high winds at the time of the stop.

This court has parsed this Kansas statute several times in similar traffic stop challenges, so will not repeat its discussion at length. *See United States v. Jones*, 501 F.Supp.2d 1284 (D.Kan. 2007); *United States v. Neeley*, 527 F.Supp.2d 1326 (D.Kan. 2007); *United States v. Maldonado*, 2009 WL 2760798 n.2 (D.Kan. Aug. 26, 2009). The Tenth Circuit has found that even a one-time swerve onto the shoulder of the road can give rise to an articulable suspicion of a section 8-1522(a) violation. *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003). The particular facts and circumstances of each case determine the result.'" *United States v. Finney*, 316 Fed. Appx 752, *4 (10th Cir. 2009); *See United States v. Pulido-Vasquez,* 311 Fed.Appx. 140, 142, 2009 WL 323138, 1 (10th Cir. 2009) (finding one swerve across the fog line for about two seconds for no apparent weather, road, or traffic-related reason sufficient to give rise to reasonable suspicion of violation of same statute); *United States v. Egan*, No. 06-3426, 256 Fed.Appx. 191, 2007 WL 4179083 (10th Cir. Nov. 27, 2007); *United States v. Brown*, 234 Fed.Appx. 838, 844-45 (10th Cir. 2007).

Other cases have consistently found reasonable suspicion under circumstances similar to those in this case, applying the general rule that:

> an officer's observation of a vehicle straying out of its lane multiple times over a short distance creates reasonable suspicion that the driver violated Kan. Stat.

Ann. § 8-1522(a) so long as the strays could not be explained by adverse physical conditions such as the state of the road, the weather, or the conduct of law enforcement. *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003); *United States v. Zabalza*, 346 F.3d 1255, 1258-59 (10th Cir.2003); [ *United States v.] Ozbirn*, 189 F.3d [1194] at 1198 [ (10th Cir.1999) ].

*Egan*, 256 Fed.Appx at 195, 2007 WL 4179083 *4. Here, the degree of defendant's lane deviation was minimal, since the defendant merely "touched the line," but the frequency of his violation was high, as defendant did so three times within one-half mile.

The facts established through the testimony of Trooper Smith provide ample support for reasonable suspicion that the defendant's three instances of touching the line within half a mile violated K.S.A. § 8-1522. Defendant failed to show any "special circumstance" justifying his departure from the general rule of lane maintenance. *See United States v. Neeley*, 527 F.Supp.2d 1326 (D.Kan. 2007). Alternatively, the facts support a reasonable suspicion that the driver was impaired, providing an independent basis for a valid stop. *See United States v. Perales*, 2010 WL 1254710 (10th Cir. April 2, 2010).

**Subsequent Detention**

Defendant next challenges the scope of the questions asked during his detention. Questions unrelated to the initial stop are not illegal unless they make the stop longer, as the Supreme Court has recently clarified:

> An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *See*

*Muehler v. Mena*, 544 U.S. 93, 100-101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

*Arizona v. Johnson*, --- U.S. ----,129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009).

The court has reviewed the video tape of the stop and finds that the entire traffic stop from the initial contact to Trooper Smith's saying "Adios," lasted approximately eleven minutes. Trooper Smith's questions to defendant which were unrelated to the reason for the traffic stop were few and did not measurably extend the duration of the stop.

Secondly, defendant contends that Trooper Smith never moved away from the truck and never told defendant he was free to leave, extending the length of his *Terry* detention until the time of his arrest.

A traffic "stop generally ends when the officer returns the driver's license, registration, and insurance information." *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003), *cert. denied*, 541 U.S. 911, 124 S.Ct. 1622, 158 L.Ed.2d 259 (2004). *See Brendlin v. California*, 551 U.S. 249, 258,127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). A traffic stop may evolve into a consensual encounter, for "[o]nce the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has objectively reasonable cause to believe that he is not free to leave." *United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006). "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.' "*United States v. Bradford*, 423 F.3d 1149,1158 (10th Cir. 2005) (quoting *United States v. West*, 219 F.3d 1171, 1176

9

(10th Cir. 2000)). Under this standard, "an officer is not required to inform a suspect that she does not have to respond to questioning or that she is free to leave." *Id.* A court looks at whether the officer made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled suggesting that the detention had not ended." *Id.* at 1159 (internal quotation marks and citation omitted).

Farewell language such as "Adios" suggests that any subsequent discussion was consensual. *See United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006). Testimony at the hearing, coupled with the court's review of the video, reveals no indicia of coercion, and convinces the court that Trooper Smith's statements and acts established a consensual encounter at the moment he said "Adios."

**Consent to search**

Defendant additionally contends that Trooper Smith lacked consent to search the truck, claiming that if anyone gave consent, it was not the defendant but the passenger, whose consent was invalid.

A law enforcement officer may conduct a warrantless search of a vehicle "if a person in control of the vehicle has given his voluntary consent to the search." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir.2001). A person who lacks any common authority over the automobile cannot validly consent to its search. *United States v. Campos-Campos*, 198 F.3d 259, 1999 WL 987359 at *4 (10th Cir.1999), citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Trooper Smith testified that the defendant gave consent by nodding his head and

by saying "Si" or "Yes," although the passenger also verbally consented. The court credits this uncontradicted testimony, and finds it supported by the video tape to the extent the tape shows the defendant nodding his head up and down in response to the Trooper's request for consent, signifying agreement. Sufficient evidence of defendant's valid and voluntary consent has been established.

**Movement of truck**

Defendant next contends that Trooper Smith's direction for defendant to follow him and move the truck to Troop B "further exacerbated [his] already illegal detention." Dk. 15, p. 6. By this, defendant appears to argue that his detention became an illegal arrest without probable cause because of the forced movement of his truck.

The Court has found that defendant's detention was converted to a consensual encounter at the moment the trooper returned his documents and said, "Adios," although not solely because of those facts. Thereafter, the trooper inspected the truck and found evidence that created a reasonable suspicion, if not probable cause, that the defendant was engaged in criminal activity, likely involving drug trafficking. *See Ledesma*, 447 F.3d at 1317 (" ...visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search.") It is well established that officers may ask or force a suspect to move as part of a lawful *Terry* stop. *United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009), *cert. denied*, __ U.S. __, 130 S.Ct. 1721, 176 L.Ed.2d 202 (2010). "The Supreme Court has acknowledged that 'there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention.'" *White*, quoting *Florida v. Royer*, 460 U.S. 491, 504, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

11

Here, the *Terry* stop at issue evolved from a mere traffic stop to one based on reasonable suspicion of criminal activity before defendant was asked to move the truck. Trooper Smith asked the defendant to travel in the same direction he had been going and established that their destination was very close to I-70. The facts show that Trooper Smith's instruction to follow him was for defendant's convenience to expedite the dog sniff and get defendant on his way more quickly, if the sniff dispelled reasonable suspicion. Given the direction, distance, and purpose of the movement of the truck, the court finds no illegality in Trooper Smith's direction for defendant to follow him to Troop B.

**Miranda warnings**

Defendant admits that after he was arrested he was advised of his *Miranda* rights, but alleges that the officer's ability to speak Spanish was limited and defendant did not understand that he had the right to have counsel appointed to represent him before speaking with law enforcement officers. He additionally contends that he could not have voluntarily waived rights which he did not understand.

The government has the burden of proving a valid waiver by a preponderance of the evidence. *United States v. Burson*, 531 F.3d 1254 (10th Cir. 2008). It is a bedrock principle that the waiver of one's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." *United States v. Morris*, 287 F.3d 985, 988 (10th Cir.), *cert. denied*, 536 U.S. 933,122 S.Ct. 2612,153 L.Ed.2d 797 (2002), quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

The court's inquiry into a waiver's validity has two dimensions:

First, the relinquishment of the right must have been voluntary in the sense that it

12

was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*United States v. Smith*, __ F.3d __, 2010 WL 2197524, *3 (10th Cir. June 3, 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

**Knowing and intelligent**

A waiver is knowing and intelligent if it is made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Warnings given in a language which the defendant cannot comprehend do not convey the substance of the suspect's rights. *See United States v. Bustillos-Munoz*, 235 F.3d 505, 517 (10th Cir. 2000) (waiver knowing and intelligent because imperfect translation into a language which defendant understood conveyed the substance of the rights waived); *United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir.1996) (same); *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (acknowledging that language barriers may inhibit a suspect's ability to knowingly and intelligently waive his Miranda rights).

*United States v. Alarcon*, 95 Fed.Appx. 954, 956-957, 2004 WL 853180, 3 (10th Cir.

2004).

At the evidentiary hearing, Officer Montalvo testified that he served as an interpreter during defendant's Miranda warnings and subsequent interview. He is of Hispanic origin and speaks fluent Spanish, which is his first language. Although he is Puerto Rican and knows a different dialect of Spanish than is spoken in parts of Mexico, he is comfortable interpreting "Mexican Spanish," and often serves as an interpreter for Spanish speakers in his job as a police officer. His habit is to tell defendants to let him know if they have any trouble understanding him, and tells them he will do likewise. Officer Montalvo testified that he gave defendant this same instruction, and defendant indicated in Spanish that he understood. He gave defendant *Miranda* warnings in Spanish, and defendant verbally waived them. He had no difficulties communicating with the defendant, who appeared to understand the questions he translated, and never complained that he did not understand.

Based upon the officer's uncontroverted and credible testimony, the court finds that defendant communicated sufficiently in Spanish with Officer Montalvo to fully understand both the nature of the right being abandoned and the consequences of that decision, so finds defendant's waiver to be knowing and intelligent.

**Voluntary**

The Court next examines whether any waiver was voluntary. Here, the Court examines whether the defendant's relinquishment of the right was voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion, or deception. *See United States v. Hernandez*, 913 F.2d 1506, 1509 (10th Cir.1990), *cert. denied*, 499 U.S. 908,111 S.Ct. 1111,113 L.Ed.2d 220 (1991).

> In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect.

*Smith*, __ F.3d __, 2010 WL 2197524, *3 (10th Cir. June 3, 2010). "In addition, identifying coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.* Here, no coercion has been alleged or shown.

Additionally, although *Miranda* invocations of rights must be explicit and unambiguous, *Miranda* waivers may be implied. *Berghuis v. Thompkins*, __ U.S __, __ S.Ct.__, 78 USLW 4479, 2010 WL 2160784, (June 1, 2010) (defendant who neither explicitly invoked nor expressly waived his *Miranda* rights can be found to have impliedly waived such rights by answering officer's question.) The government has met its burden to show that defendant's waiver of his Miranda rights was voluntary, knowing and intelligent.

IT IS THEREFORE ORDERED that defendant's motion to suppress (Dk. 15) is denied.

Dated this 23rd day of June, 2010.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge